UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

NIAGARA MOHAWK POWER CORPORATION,
d/b/a NATIONAL GRID,

                         Plaintiff,

   vs.                                              5:09-CV-00471

HUDSON RIVER-BLACK RIVER REGULATING
DISTRICT and NEW YORK STATE DEPARTMENT
OF ENVIRONMENTAL CONSERVATION,

                         Defendants.
_____

**APPEARANCES:**                                 **OF COUNSEL:**

Hiscock & Barclay, L.L.P.                    Mark D. Lansing, Esq.
50 Beaver Street
Albany, New York 12207-2830
*Attorney for Plaintiff*

Crane, Parente & Cherubin                 David M. Cherubin, Esq.
Regulating District
90 State Street, Suite 1515
Albany, New York 12207
*Attorney for Defendant Hudson River-Black River*

Andrew M. Cuomo                         Charles J. Quackenbush, Esq.
Attorney General of the State of New York     Assistant Attorney General
The Capitol
Albany, New York 12224
*Attorney for Defendant NYS Department of*
*Environmental Conservation*

**Norman A. Mordue, Chief U.S. District Judge:**

## MEMORANDUM DECISION AND ORDER

I.     **INTRODUCTION**

     Plaintiff, Niagara Mohawk Power Corporation d/b/a National Grid, is a former hydroelectric power generating company which now merely transmits and distributes energy resources, but still owns various real estate parcels along the Hudson River, Sacandaga River and Black River Basins. This case involves primarily plaintiff's claims against the Hudson

River-Black River Regulating District, ("the District") a New York state agency that regulates water flow in the basins of the Hudson, Sacandaga, Black and Beaver Rivers and operates, *inter alia*, the Conklingville Dam and its related body of water, Great Sacandaga Lake. Niagara Mohawk asserts that the District has been assessing and apportioning "headwater benefit" charges to the public utility pursuant to New York state environmental conservation law in violation of the federal preemption doctrine. Presently before the Court is Niagara Mohawk's motion for a preliminary injunction and the New York State Department of Environmental Conservation's ("DEC's) motion to dismiss.

**II.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND**

Briefly, the relevant facts are these: The District is a New York public benefit corporation created in 1959 by legislation that combined the then-existing Hudson River and Black River Regulating Districts. *See* N.Y. ENVTL. CONSERV. LAW §§ 15-2137, 15-2139, 15-2141.[1] The District's statutory mission is to regulate the flow of the Hudson and Black Rivers "as required by the public welfare including health and safety." N.Y. ENVTL. CONSERV. LAW §§ 15-2103(1), 15-2139(2). In furtherance of this statutory directive, the District, *inter alia*, builds and operate reservoirs, issues bonds and apportions costs on statutorily defined beneficiaries to finance the construction, maintenance and operation of its river regulating reservoirs. *See* N.Y. ENVTL. CONSERV. LAW §§ 15-2103(1), 15-2109, 15-2111, 15-2123, 15-2125, 15-2129, 15-2133. The focal point of the District's operation in the Hudson River watershed is its ownership and operation of the Conklingville Dam and its related body of water, the Sacandaga Reservoir, now known as Great Sacandaga Lake.

---

[1] The Hudson River Regulating District was originally formed in 1922 and the Black River Regulating District was originally formed in 1919.

Pursuant to N.Y. ENVTL. CONSERV. LAW § 15-2121, the District (and its predecessor) is required to apportion the cost of its capital, operation and maintenance costs for the facilities and property it owns through an annual assessment charged to all owners of property that are benefitted by its services. The District (including its predecessor) has used the same method of apportionment to determine its annual assessments of costs continuously since its original adoption in 1925. The District's method of apportionment for the Hudson River Area attributes approximately 95% of the project's benefits to parcels of property that have fall or "head" on the river, and which therefore derive, or potentially derive, the benefit of increased water power production – whether hydroelectric, industrial (e.g., mills), or merely potential (undeveloped). The remaining 5% is allocated to municipalities along the river for flood control, flow augmentation, and sanitary benefits such as wastewater assimilation.

The District enacts a three-year budget triennially, based on its estimates and determinations related to the cost of operating and maintaining the District's dams, reservoirs and other improvements. N.Y. ENVTL. CONSERV. LAW § 15-2125.[2] The District issues annual assessments on July 1st of each year, covering the July 1st - June 30th fiscal year. The assessments allocate a portion of the District's budget on "statutory beneficiaries" in proportion to their percentages set forth in the original 1925 Apportionment of Cost. *See* N.Y. ENVTL. CONSERV. LAW §§ 15-2121, 15-2123, 15-2125. Although at the time the original apportionment and assessment was rendered by the District, Niagara Mohawk owned and operated hydroelectric power plants along the Hudson River, the company has since divested all of its power plant operations. Niagara Mohawk's successor, National Grid, continues to own various parcels of

---

[2] The District's funding comes from three revenue sources: 1) annual assessments charged to "statutory beneficiaries;" 2) permit fees charged for the use of state-owned lands in and around Great Sacandaga Lake; and 3) revenues from a hydroelectric site agreement with Erie Boulevard Hydropower, L.P. for the use of state-owned head and water rights at Conklingville Dam.

land along the Hudson River which the District considers to be "developable" hydroelectric generation sites. These sites are assessed by the District under its original 1925 apportionment method.

National Grid alleges that notwithstanding the District's practice of allocating 95% of its annual Apportionment of Cost to the hydroelectric projects which benefitted from its services and the other 5% to municipalities, various studies and consultants had advised the District over time that numerous unassessed, but benefitted parcels along the Hudson River and Great Sacandaga Lake were not paying the apportionments required by N.Y. ENVTL. CONSERV. LAW § 15-2121. As stated rather succinctly by counsel for DEC in the agency's motion papers, it seems undisputed at the very least that, "circumstances have evolved" since 1925 "which arguably call for the District to revise its apportionment." Indeed, the District retained a consulting firm, Gomez & Sullivan, in September 1999 to perform an independent Hudson River flow regulation study which revealed finally in July 2003, that there are seven categories of economically determinable benefits (flood protection, lake recreation, hydroelectric power generation, waste assimilation, whitewater recreation, navigation and lakeshore properties) by which the District's annual budget could or should be apportioned.

In September 2002, as part of obtaining a required license from the Federal Energy Regulatory Commission ("FERC") for the operation of the Conklingville Dam and Great Sacandaga Lake, the District entered into an Offer of Settlement with DEC, Niagara Mohawk, and numerous other interested agencies, businesses and property owners which included, *inter alia*, an agreement by the District to conduct a reapportionment to update its assessment methodology. Concurrent with the licensing order, FERC approved the Offer of Settlement. To date, the District has not completed or even begun the agreed reapportionment effort.

National Grid timely grieved and challenged judicially the apportionments and assessments assigned to it by the District for fiscal years 2000-01 through 2008-09 related to real estate parcels it owns along the Hudson River and Sacandaga River Basins. These state judicial and/or administrative proceedings are still pending. In June 2006, Albany Engineering Corporation, a FERC licensee in its capacity as owner and operator of the Mechanicville Hydroelectric Project, filed an administrative complaint with FERC contending that pursuant to the Federal Power Act ("FPA"), state agencies such as the District lack authority to assess Albany Engineering for the regulating benefits provided by the Conklingville Dam. Specifically, Albany Engineering contended that FPA § 10(f) provides the exclusive means by which the owner of a facility licensed by FERC can assess charges to downstream beneficiaries of its water regulating operations. To wit, FPA § 10(f) provides as follows:

> f) Reimbursement by licensee of other licensees, etc.
>
> That whenever any licensee hereunder is directly benefited by the construction work of another licensee, a permittee, or of the United States of a storage reservoir or other headwater improvement, the Commission shall require as a condition of the license that the licensee so benefited shall reimburse the owner of such reservoir or other improvements for such part of the annual charges for interest, maintenance, and depreciation thereon as the Commission may deem equitable. The proportion of such charges to be paid by any licensee shall be determined by the Commission. . . .

16 U.S.C. § 803(f). Further, § 27 of the FPA limits the state's regulation of matters **affecting** federally licensed power projects to matters of municipal use and irrigation:

> Nothing contained in this chapter shall be construed as affecting or intending to affect or in any way to interfere with the laws of the respective States relating to the control, appropriation, use, or distribution of water used in irrigation or for municipal or other uses, or any vested right acquired therein.

16 U.S.C. § 821. Albany Engineering charged that the District's assessment and apportionment scheme, clearly outside the realm of laws merely controlling "irrigation" or "municipal" water

5

use, violated the FPA in two ways- first, the District's annual assessments were not determined by FERC to be "equitable" and second, the District was imposing charges for its operations under N.Y. ENVTL. CONSERV. LAW § 15-2121 well in excess of the cost of "interest, maintenance and depreciation" authorized by the FPA.

FERC agreed that pursuant to the FPA, the District was required to obtain approval of the charges apportioned to Albany Engineering and others for interest, maintenance and depreciation of the Conklingville Dam without obtaining approval from FERC. However, FERC ruled that Section 10(f) preempts state law only to the extent the state seeks to impose charges for interest, maintenance and depreciation. FERC disagreed with Albany Engineering's contention that the District was prohibited from assessing additional charges for its operational costs. On appeal, the D.C. Circuit reversed FERC's administrative determination, holding that federal law preempts states from exacting compensation from downstream hydropower plants that receive "headwater benefits" from upstream dam operators. *Albany Eng'g Corp. v. Fed. Energy Regulatory Comm'n*, 548 F. 3d 1070, 1076-77 (D.C. Cir. 2008). Indeed, the Circuit court held that FPA §10(f) must be understood to "preempt[] **all** state headwater benefits assessments." *Id.* at 1079 (emphasis in original). The D.C. Circuit did not address Albany Engineering's claim that FERC had the power to order the District to refund assessments it had collected in violation of federal law. Rather, the panel left the issue of an appropriate remedy for FERC to resolve on remand. FERC has not yet issued a final determination in the matter of Albany Engineering's administrative complaint.

National Grid filed the present action primarily on the basis of the D.C. Circuit's decision in *Albany Engineering*. The company asserts that the District is preempted from apportioning and assessing costs to hydroelectric projects licensed by FERC or "parcels that are or would be

6

subject to FERC's oversight as the District characterizes such parcels as purportedly 'developable hydroelectric sites.'" The complaint alleges five causes of action. The first seeks a preliminary injunction to preclude the District from continued application of its "illegal [a]ssessment [m]ethodology." The second requests declaratory relief in the form of a judgment limiting the District's authority to make assessments based on the federal preemption doctrine. The third cause of action also seeks a declaratory judgment that the District's apportionment and assessment scheme, together with its alleged failure to comply with the FPA violates the Equal Protection clause of the Fourteenth Amendment insofar as it treats National Grid's property differently from other similarly situated parcels. The fourth cause of action seeks a declaration that the District's permit system final rules are preempted by the FPA. Finally, in its fifth cause of action, National Grid claims the assessments and the apportionment methodology used by the District constitutes an unconstitutional taking under both the federal and New York State constitutions.

On April 30, 2009, prior to issuance of the District's three year budget for fiscal years 2009-10 through 2011-12, which contained the District's annual assessments based on its eighty-year old Apportionment of Cost, National Grid filed an emergency motion seeking a preliminary injunction. Although the motion was filed as an Order to Show Cause seeking a temporary restraining order, the Court did not view the long-standing circumstances between the parties as emergent. Thus, the Court ordered a somewhat expedited, but nevertheless sufficient briefing schedule concerning the requested relief. The District has filed papers in opposition to the motion. DEC essentially takes no position on National Grid's application for preliminary injunctive relief insofar as it pertains to the claims against the District. DEC opposes the preliminary injunction only as it may be deemed to relate even tangentially to the agency. DEC

has also filed a cross-motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6). The Court will first address National Grid's application for a preliminary injunction.

### III.   DISCUSSION

A.   Applicable Legal Standard

A party seeking a preliminary injunction "must demonstrate (1) irreparable harm should the injunction not be granted, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions going to the merits and a balance of hardships tipping decidedly toward the party seeking injunctive relief." *Resolution Trust Corp. v. Elman*, 949 F. 2d 624, 626 (2d Cir. 1991); *accord Plaza Health Lab., Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir. 1989). The requirement of irreparable harm is the single most important prerequisite for the issuance of injunctive relief. *See Reuters Ltd. v. United Press Intern., Inc.*, 903 F.2d 904, 907 (2d Cir. 1990).

A movant seeking a prohibitory injunction to maintain the *status quo* must meet the familiar requirement of showing a likelihood of success on the merits or sufficiently serious questions going to the merits and a balance of hardships tipping decidedly in movant's favor. *Resolution Trust*, 949 F. 2d at 626. Where, however, a movant seeks a mandatory injunction to alter the *status quo* by commanding some positive act, he must meet a heightened standard of demonstrating a likelihood of success by a "clear" or "substantial" showing. *See Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 34 (2d Cir. 1995). Further, the heightened standard applies whenever "an injunction – whether or not mandatory – will provide the movant with substantially all the relief that is sought." *Id.* at 33-34. In this case, National Grid is asking the District to cease assessing costs as it has done for over eighty years pursuant to N.Y. ENVTL. CONSERV. LAW § 15-2121 and/or to discard its current apportionment method and conduct a

reapportionment. Clearly these actions would disrupt the *status quo*, thus triggering National Grid's obligation to demonstrate substantial likelihood of success on the merits.

The heart of National Grid's complaint in this case is a dispute over the fact or amount of future assessments collected by the District and a demand for the refund of past assessments paid. "[B]ecause monetary injury can be estimated and compensated, the likelihood of such injury usually does not constitute irreparable harm." *Brenntag Intern. Chems., Inc. v. Bank of India*, 175 F.3d 245, 249 (2d Cir. 1999) (citations omitted). "[P]erhaps [a] more accurate description of the circumstances that constitute irreparable harm is that where, but for the grant of equitable relief, there is a substantial chance that upon final resolution of the action the parties cannot be returned to the positions they previously occupied." *Id.* National Grid argues that it should prevail on the question whether irreparable harm will inure to it absent the issuance of a preliminary injunction because it is well-settled that "irreparable injury results when constitutional and statutory rights are violated." Assuming the truth of National Grid's contention that this case is not just about money and that alleged possible violation of its constitutional rights in this case is sufficient to constitute irreparable harm, the point is moot since National Grid cannot - at this juncture - satisfy the initial burden of demonstrating a substantial likelihood of success on the merits of its claims.

B.      Application of FPA § 10(f) and Federal Preemption Doctrine

Although National Grid relies heavily, if not primarily, on the D.C. Circuit's holding in *Albany Engineering* in presenting its preemption claims herein, National Grid is not identically or even similarly situated to Albany Engineering insofar as application or relevance of the FPA. Quite simply, FPA § 10(f), by its title and terms, applies only to "licensed" or "unlicensed" hydroelectric power projects. Indeed, the title of § 10(f) is "Reimbursement by **licensee** of other

9

**licensees**, etc..*"* 16 U.S.C. § 803(f) (emphasis added).  The D.C. Circuit did not hold in *Albany Engineering* that the District, a FERC licensed operator of the Conklingville Dam, was preempted by the FPA from collecting assessments from **property owners** along the Hudson River and Great Sacandaga Lake.  Rather, the panel merely held that the District was prohibited under federal law from apportioning its operation costs to other FERC licensees, such as Albany Engineering, an owner and operator of a hydroelectric project downstream of the Conklingville Dam.

National Grid offers contrary statements - but no evidence - concerning its stature as a FERC licensee in this case.  In its initial moving papers, National Grid's counsel asserted in a memorandum of law that the company is "not a FERC licensee."  In reply to the District's opposition papers, National Grid's counsel avers that regardless of the question whether FPA § 10(f) applies only to licensed hydroelectric power projects, "National Grid is a co-licensee for the Hudson Falls and South Glens Falls Projects."  However, National Grid's counsel does not state the source of his personal knowledge of this averment nor does he provide evidence or details of the alleged co-licensing agreement.  Moreover, National Grid does not provide information concerning the connection, if any, between: 1) these power projects and the Conklingville Dam; and 2) National Grid's alleged co-licensure of these projects and the District's apportionment and assessment scheme.  While it is true that FPA also applies to **unlicensed** power projects,[3] the FPA, by its very title, applies only to hydroelectric power facilities, and not to "developable hydroelectric projects" or "FERC assessees" as referenced in the complaint.

---

[3] FPA § 10(f) provides: Whenever any power project not under license is benefitted by the construction work of a licensee or permittee, the United States or any agency thereof, the Commission, after notice to the owner or owners of such unlicensed project, shall determine and fix a reasonable and equitable annual charge to be paid to the licensee or permittee on account of such benefits, or to the United States if it be the owner of such headwater improvement.  16 U.S.C. § 803(f).

The complaint also alleges that most, if not all, of the District's directives and operations are preempted by the FPA which - according to National Grid - reserves to the states only the power to regulate navigable waterways for purposes of irrigation or municipal use. *See* 16 U.S.C. § 821. The Court, however, is not persuaded that the Supreme Court's decision in *First Iowa Hydro-Elec. Co-op. v. Fed. Energy Regulatory Comm'n*, 328 U.S. 152 (1946), which interpreted the FPA's "savings clause" for the states, should be read as broadly as suggested by National Grid. After all, the District's assessment and apportionment methodology, as applied to mere property owners such as National Grid, does not appear to contemplate the FPA or interfere with the jurisdiction of FERC. Moreover, whether the FPA should be read to preempt all functions or activities of the District outside the areas of irrigation and municipal use is a legal question quite apart from the limited holding of *Albany Engineering*.

C.  Motion to Dismiss

Applicable Standard of Review

The standard applicable to motions to dismiss are well-settled. On a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), the Court must accept the allegations of the complaint as true, and draw all reasonable inferences in favor of the nonmoving party. *See Grandon v. Merrill Lynch & Co.,* 147 F.3d 184, 188 (2d Cir. 1998); *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir. 1995). In addition, the Court may not dismiss the complaint unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Nettis v. Levitt,* 241 F.3d 186, 191 (2d Cir. 2001) (quotation omitted). Therefore, the issue before the Court on such a motion "is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *King v.*

*Simpson,* 189 F.3d 284, 287 (2d Cir. 1999) (quoting *Villager Pond, Inc. v. Town of Darien,* 56 F.3d 375, 378 (2d Cir. 1995)).

DEC has moved to dismiss on the ground that plaintiff states no legally viable claim against it. The Court agrees. DEC is referenced in three places in the complaint. First, National Grid asserts that DEC is "required to review and approve all apportionments recommended by the District for the collection of its budgets, review and approve all proposed regulations by the District and receive and review annual reports from the District regarding its operations." Second, National Grid contends that the District and DEC, by signing the Offer of Settlement before FERC in April 2000, "obligated themselves to complete a reapportionment" of the original 1925 assessment on which the District bases its current apportionment. Third, National Grid argues that the District and DEC "failed to make a good faith effort to effectuate a reapportionment."

There are five causes of action in the complaint, none of which are based on the alleged actions or inactions of DEC. The first seeks a preliminary injunction against continued application of the District's assessment and apportionment scheme. The second, third and fifth causes of action request declaratory relief against the alleged unlawful and/or unconstitutional actions of the District and its assessment and apportionment methodology. The fourth claim asserts that the District's permitting system is also illegal and preempted by the FPA. It appears undisputed that while DEC exercises some oversight in connection with the District's budget and regulatory functions, the District is a separate and distinct public authority. Although it is undisputed that DEC has the authority to approve any plan for reapportionment submitted by the District, none has yet been submitted. Further, plaintiff cites no authority suggesting that DEC has the power to order or force a reapportionment. Moreover, while it is patently obvious that a

reapportionment by the District is required and/or necessary, the complaint does not seek reapportionment as an avenue of relief. Even assuming DEC obligated itself to conduct or could force the District to conduct a reapportionment by way of signing the Offer of Settlement, there is no claim for breach of the agency's alleged legal or contractual duties in the complaint. Because there is no legal or factual connection between the alleged actions or inactions of DEC and the causes of action and/or relief as set forth in the complaint, the Court finds dismissal of the claims against DEC appropriate at this time.

## IV.     CONCLUSION

Based upon the foregoing, it is hereby

ORDERED plaintiff's motion for a preliminary injunction is DENIED; and it is further

ORDERED that DEC's motion to dismiss plaintiff's claims is GRANTED and plaintiff's claims against DEC are dismissed.

IT IS SO ORDERED.

Date:   September 16, 2009
        Syracuse, New York

_____
Norman A. Mordue
Chief United States District Court Judge